## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAX A. RADY,

        Plaintiff,

    v.

THE BOSTON CONSULTING GROUP, INC.,

        Defendant.

Civil Action No. 1:26-cv-12979

### COMPLAINT FOR PATENT INFRINGEMENT

Dr. Max A. Rady ("Dr. Rady"), by his attorneys, Whiteford, Taylor & Preston LLP and Sinclair Law LLC, respectfully files this Complaint against Defendant The Boston Consulting Group, Inc. ("BCG"), for direct and indirect patent infringement and alleges as follows:

### OVERVIEW

*Background: Failure of the Diamond Industry to Reliably Track Diamonds*

1. This lawsuit relates to the long felt need for a way to track diamonds, gems, other valuable physical artifacts, shut down the blood diamond industry, prevent fakes, counterfeits and forgeries, the failure of multiple industries to find an acceptable solution, the invention of a solution by a brilliant young physicist, Dr. Max Rady, and the wholesale theft of that invention by BCG and the De Beers diamond conglomerate. Notwithstanding this theft, Dr. Rady has obtained several patents for his invention, including the patents asserted herein, U.S. Patents 12,401,496, and 12,580,734, Exhibits 1 and 2, respectively. Meanwhile, BCG and De Beers have made Dr. Rady's invention central to their businesses, infringing Dr. Rady's invention

on a massive scale. Following the success of Tracr, BCG launched the IoT Sensor Box using Dr. Rady's technology and advised its clients to install on their premises IoT enabled devices, including 3D laser scanners and spectral imaging cameras, where the box used the 3D scan data and spectra data generated by the IoT enabled devises to create a digital twin and digital fingerprint for item authentication, tracking and proof of provenance throughout the supply chain.[1] BCG has also introduced a specialized product suite as a new core product offering using Dr. Rady's patented technology, called Value Chain Digital Twin.[2] Value Chain Digital Twin is offered by BCG to its clients as a hybrid SaaS-business model, which is an advanced platform that allows clients to expand on their existing infrastructure to build full high fidelity digital twins of their physical products, for end-to-end transparency of supply chains for product identification, authentication of manufactured real-world physical objects and real-estate by using IoT enabled devices to capture the physical features such anomalies, imperfections, etc. BCG has induced numerous clients including Renault, BMW, Ford, Nestle, GM, Shell, Bank of New York Mellon (BNY),[3] JPMorgan, Sanofi, GlaxoSmithKline, Boeing, Airbus, Goldman Sachs, Temasek, Google, and Bayer to infringe Dr. Rady's invention. Indeed, De Beers has made Dr. Rady's invention central to their new business model, even going so far as to file for and obtain U.S. Patents taken directly from Dr. Rady's confidential disclosures to BCG.

---

[1] https://www.bcg.com/publications/2018/blockchain-internet-of-things-made-for-each-other; see also: https://www.bcg.com/publications/2019/investor-guide-blockchain-fraud-and-loss-prevention

[2] Also referred to as Bionic Supply Chain and/or Metachain AI.

[3] Roman Regelman, a partner and managing director at BCG and Vice-Chair of B-Capital, the venture funding arm of BCG, who was involved in the dispute of Dr. Rady with BCG regarding the misappropriation of his technology, transferred to BNY Mellon as the CEO of Securities Services and Digital while maintaining his role as Vice-Chair of B-Capital. Mr. Regelman implemented the digital asset agenda for BNY focusing on business applications that involve Dr. Rady's technology such as real-world asset (RWAs) tokenization.

## PARTIES

2. Dr. Rady is a citizen of the United States of America currently residing in France.

3. BCG is a corporation organized under the laws of Massachusetts with offices throughout the world, including this Judicial District.

4. The claims herein  namely the theft of Dr. Rady's patented invention by BCG and De Beers, the use of Dr. Rady's patented invention by BCG and De Beers to develop the Tracr platform ("Tracr," "Tracr Platform," "Tracr Technology," and "Tracr Solution") and diamond scanning machines required for the platform, the filing by De Beers of patent applications for Dr. Rady's invention, but failing to name Dr. Rady as the proper and sole inventor, the launch of the Tracr platform by BCG and De Beers for diamond registration, identification, authentication and tracking for the diamond industry, and  the launch of BCG's IoT Sensor Box and the Value Chain Digital Twin product offering to sell Dr. Rady's invention to its customers.

5.  BCG has created a web of business-related entities and subsidiaries to shield itself from legal responsibility and to make it difficult for Dr. Rady to hold it accountable for infringement.  Initially, these BCG widely publicized the features of its infringing devices. However, following an earlier lawsuit filed by Dr. Rady for infringement of the first of his patents to issue, BCG removed much if not all of this material from public view and began to conceal, obscure, and/or disguise the operational details of its infringing devices and systems. Accordingly, much of the evidence presented here was collected prior to Defendants' efforts to conceal their activities.

## JURISDICTION AND VENUE

6. This Court has exclusive subject matter jurisdiction over Dr. Rady's claims pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331 and 1338(a) and (b).

7. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).

8. BCG may be sued in this district because BCG is incorporated in this District.

## FACTS COMMON TO ALL COUNTS

9. The patents that are the subject of the infringement claims in this lawsuit are directed to a pioneering apparatus, system, and method for irrefutably determining and confirming the provenance, identity and authenticity of a physical object based on its own inherent physical features (self-provenance), no matter how identical it may appear even upon expert inspection. All physical objects have inherent surface and sub-surface physical features (impurities, scratches, flaws, anomalies, etc.) that distinguish them from all other physical objects in the world, even nearly identical mass produced objects that come off a manufacturing assembly line one after the other. The invention in the patents asserted in this case uses high resolution scanning devices to scan an object, for example, a diamond, a watch, a handbag, or a computer chip.

10. The invention in the patents utilizes a coordinated physical array consisting of spectral imagers and 3D scanners.[4] These hardware components cooperate to dynamically scan and measure an object, capturing a multidimensional matrix of raw physical, geometric, and

---

[4] Spectral imaging (capturing wavelengths across the electromagnetic spectrum) and 3D scanning (generating point clouds or depth maps) require physical sensor interactions with light, objects, or environments.

material data streams. The apparatus and system are uniquely configured to process these raw data streams to generate a 3D map made of thousands, tens of thousands, or even millions of points of physical features, showing all of the impurities, scratches, flaws, anomalies, etc. that were detected to create a unique digital fingerprint.[5] Crucially, this map is not limited to capturing easily alterable surface-level visual characteristics. Instead, the system penetrates the exterior boundaries of the target object mapping all subsurface physical features of the imaged object, identifying all surface and sub-surface physical features and calculating all triplet combinations and relative distances (which creates geometric triangles or invariant configurations) between these physical features. Because the digital fingerprint is derived directly from the surface and subsurface structural and material characteristics of the object, the resulting digital signature is exceptionally robust. The system successfully creates the digital fingerprint and authenticates the item even when the object has been physically modified, degraded, scratched, or weathered. This specific configuration unconventionally combines different hardware sensors to measure and interlock/fuse data of tangible physical objects to achieve an entirely new physical capability: tag-less, modification-resistant tracking solving a critical vulnerability in traditional security infrastructures, which fail completely when an item's surface appearance is altered.

11. Because no two physical objects in the world are exactly alike, that unique digital fingerprint can be used to irrefutably confirm or refute the identity of any subsequently scanned object. That is, if a designer handbag is scanned immediately upon completion of its manufacture, its

---

[5] The unique identifiers that are generated by these scanning machines are sometimes referred to by various different names, including "digital fingerprint," "fingerprint," "signature," "unique signature," "Tracr ID," "Stone ID," "Global Diamond ID," "UUID (universal unique identifier)," "digital twin," "digital replica," "digital product passport," "digital passport," and "virtual twin."

genuineness can be verified at a later date using a subsequent scan, for example at a retail location. Even if the handbag has acquired additional physical features through use, e.g., scratches, stains, etc., it will still retain many if not all of the physical features that were present when it was initially scanned. Similarly, if a rough diamond is scanned as it comes out of a mine, a later scan of a cut and polished diamond can be used to determine whether the polished and cut diamond originated from a particular rough diamond because a cut and polished diamond will still have some of the physical features (flaws, inclusions, etc.) of the rough diamond from which it was cut. In order to increase the reliability and speed of the comparison between two digital fingerprints, each unique digital fingerprint includes, in addition to the thousands (or more) of points that make up the 3D map[6] , every possible set of triplets (triangles) that can be made from the set of points. Comparing the set of triplets in one unique signature to the set of triplets in another unique signature increases both the reliability and speed of the comparison.

12. Conventional authentication is fundamentally dependent on attaching a vulnerable, secondary physical item (a tag) to an object. The claimed invention (apparatus and system) replaces this flawed paradigm by turning the object's intrinsic, atomic, and structural composition into the tag itself, creating a novel, non-invasive, non-destructive, non-contact, "tag-less" imaging architecture that relies on using spatial and spectral surface and sub-surface data to achieve authentication providing a structural and systemic security upgrade by removing the need for easily falsified external physical tokens.

---

[6] The 3D map generated by the invention and patents that are the subject of this lawsuit is a high fidelity true one-to-one digital replica of any imaged real-world physical object whether it is a gemstone, real-estate, art piece or collectibles, allowing organizations to verify product authenticity, track individual components throughout their life cycle. Moreover, the one-to-one digital replica, enabled/allowed for the first time the digitization of real-world objects/real-world assets (RWAs) based on their own inherent physical features (self-provenance) without the need to rely on proxies, overcoming the critical hurdle of creating digital assets that mirror the real-world objects/assets and reliably linking the physical object to its digital counterpart for the tokenization[6] of real-world objects/assets.

13. Prior to the invention, 3D surface scanners could not maintain the identity of an object if its outer surface was physically altered, cut, or ablated. Standard imaging systems were physically incapable of penetrating material surfaces to map stable, unalterable internal properties. The claimed invention solves this physical limitation through a novel architecture that fuses spatial data from a 3D scanner with spectral data from a spectral imager, generating a multi-layered 3D spectral-spatial map. The system then computes all possible triplets of internal structural inclusions from the physical inputs generated by the synchronized spectral imager and 3D scanner interacting with the physical features and material impurities of the physical object. The computation and use of all possible internal triplet configurations to maintain part-to-whole object identity across a destructive manufacturing process was not well-understood, routine, or conventional in the imaging, gemological, or data processing fields at the time of the invention.

14. Prior to the invention and patents that are the subject of this lawsuit, the diamond industry long struggled with keeping illegally sourced diamonds and blood diamonds from entering the global supply chain. The fact that rough diamonds undergo modification/change shape during their lifecycle made it impossible to track each rough diamond after it was modified into one or more cut/polished/finished diamonds. It was likewise impossible to trace the lineage of individual cut/polished/finished diamonds back to the rough diamonds from which they were cut.[7]

---

[7] The inability to trace the lineage of cut/polished/finished diamonds back to the specific parent rough diamonds was further exacerbated by the winding and opaque nature of the global diamond trade. Rough diamonds are usually transported from their country of origin (where they were mined) to diamond manufacturing and processing hubs in different countries. Once those diamonds are processed, cut and polished in a second country, different from the country of origin, they are considered by the United States government, and by other countries/governments, to be "substantially transformed", and are deemed as a product of that second country and not a product of the country where they were mined. Therefore, once rough diamonds were processed there was no available technical solution to prove that the cut/polished/finished diamonds were the progeny of legally sourced rough diamonds.

15. For decades, the diamond industry relied on the **Kimberley Process Certification Scheme (KPCS)** for rough diamonds, a bag and tag/parcel method for batches of rough diamonds in conjunction with a "Kimberly" paper certificate to certify that a batch of diamonds was ethically mined. However, the KPCS method was found to be ineffective in preventing so-called "conflict" or "blood" diamonds from entering the global diamond supply chain because Kimberly certificates were being falsified with the result that illegally sourced rough diamonds were being certified as legitimate. In addition, illegally sourced rough diamonds and blood diamonds were mixed with batches of ethically sourced diamonds, making verification of their source all but impossible.[8]

16. For the identification and tracking of polished/finished diamonds, the diamond industry relied on information contained in grading reports issued by diamond certification houses such as the Gemological Institute of America (GIA), the Gemological Science International (GSI) and the International Gemological Institute (IGI). The information contained in these reports included a serial number engraved/inscribed on the polished/finished stone, together with the 4Cs (cut, color, clarity and carat) and external measurements of the polished/finished diamond.

17. Using the grading reports to track polished/finished diamonds is not reliable because the serial number engraved/inscribed on the polished/finished stones can be removed by a diamond polisher (for example in the event of a theft), rendering the stones unidentifiable by the police/authorities and insurance companies because the 4Cs and the external measurement of

---

[8] The failure of the KPCS was highlighted in August 2010, when Africa's highest-ranking diamond official and a key draftsman of the Kimberly Process, African Diamond Council (ADC) and African Diamond Producers Association (ADPA) Chairman Dr. M'zée Fula Ngenge ("Dr. Ngenge"), persuaded African diamond-producing nations to renounce their support for the scheme. Dr. Ngenge blasted the Kimberly Process ("KP") for its ongoing ineffectiveness, stating that "the system has failed to thwart trading of diamonds mined as a result of human suffering". In February 2023, Dr. Ngenge contacted Dr. Rady to discuss with him his invention and solicit his professional assessment of the diamond traceability solutions provided by De Beers and several 3rd parties.

the polished/finished stones do not uniquely identify each individual polished/finished stone in the absence of the serial number. Moreover, the information contained in grading reports could not determine or trace the progeny of the cut/polished diamonds.

18. Thus, the known methods for diamond identification, authentication and tracking failed to provide a reliable, verifiable, and non-invasive solution to uniquely identify, authenticate and track each individual diamond from mine to customer or to trace the lineage of individual finished stones back to the specific rough stones from which they were cut. The known methods for diamond authentication and tracking are all susceptible to fraud/forgery, duplication and swapping, and they are wholly insufficient for irrefutably tracing of the progeny of rough diamonds or the origin of cut and polished stones.

19. For decades, the global gemstone industry relied on paperwork, auditable chains of custody, or laser-etching serial numbers onto the surface of a finished stone—all of which are highly vulnerable to fraud. Mapping *subsurface* physical structures to create a modification-tolerant digital fingerprint was an entirely non-conventional engineering approach. The claimed invention completely replaces external tracking by reading the unchanging, subsurface DNA of a rock to establish rough-to-polished progeny.

20. In the high-value gemstone supply chain, tracking and authentication has traditionally been impossible once a gemstone undergoes geometric transformation through the disruptive cutting and polishing process. Because the external shape, facets, and surface geometry change entirely, traditional visual metrics, serial numbers, or external tags are destroyed during manufacturing. The claimed invention solves this long-standing industrial bottleneck through an innovative multi-sensor architecture. By utilizing one or more imagers, the system generates a comprehensive 3D map that captures both the external topography and the internal, subsurface physical structures and material inclusions of a rough gemstone,

identifying all surface and sub-surface physical features and calculating all triplet combinations and relative distances (which creates geometric triangles or invariant configurations) between these physical features. Because these subsurface physical features and material signatures remain structurally locked inside the stone throughout the manufacturing process, they are invariant, so when a rough stone is cut into multiple smaller stones, the children stones will contain some of the triplet combinations of the parent stone. The invention uses this multi-layered data to create a digital fingerprint capable of unequivocally identifying that a specific polished gemstone was cut from a specific rough gemstone. By mapping these unalterable subsurface characteristics, the invention establishes absolute, tamper-proof self-provenance across the entire lifecycle of the material, surviving radical physical modifications, maintaining an object's identity and overcoming physical transformation of tangible objects.

21. The disadvantages of the known methods for identification, authentication and tracking are not limited to diamonds and other gemstones. Manufactured goods in various industries including electronics, pharmaceutical, automotive, aerospace, defense, and luxury goods, are plagued with counterfeiting problems due to the lack of a verifiable and irrefutable mechanism to identify and trace genuine products, exposing manufacturers, distributers, retailers and consumers to heightened risks from counterfeit drugs, fraudulent materials and defective parts. These risks drive up costs, erode revenues, and damage reputations and brands.

22. Unlike conventional systems that require the attachment and scanning of external, forgeable physical tokens—such as RFIDs, microchips, or barcodes, which are susceptible to fraud/forgery, duplication and swapping, and they cannot be relied upon when an object has been modified or for determining whether an object has been modified, the claimed invention represents a paradigm shift in identification and authentication technology. By utilizing one

or imagers, the system transforms the intrinsic, sub-surface material characteristics of the modified object itself into a secure, tag-less digital fingerprint, thereby eliminating the physical vulnerabilities and manufacturing overhead of traditional tracking metrics, allowing a physical object to autonomously (self-provenance) verify its own identity.

23. De Beers Group, the largest diamond producer in the world, suffering from negative public reputation due to contamination of its diamond supply by blood/conflict diamonds and the growth and popularity of lab-grown diamonds, in an attempt to improve its negative public image decided to find a way to reliably establish the provenance of its diamonds and track their diamonds through the entire diamond lifecycle from rough to cut to polished to customer, but struggled to find a solution. In 2017, De Beers engaged the services of BCG to develop a solution to identify, authenticate and track diamonds through the entire supply chain. However, as late as January 2018, the CEO of De Beers said that the solution was difficult to find and had not yet been found. See ¶40, below.

*Dr. Rady invented the solution for reliably identifying and tracking diamonds*

24. In 2014, Dr. Rady (still just Mr. Rady at the time) who studied optics, optical properties, light matter interaction, photonics, spectroscopy, 3D and statistical modeling and analysis for predictive rendering related to dielectric and conductor materials, including gemstones, metals, and glass, was working to develop an improved method for physical based computer rendering of scenes. This technology has broad application in nearly all industries. Physical based rendering (computer based rendering of things, including scenes, objects, buildings, landscapes, etc., that is "photorealistic"), is used in industries such as advertising, television and film, and video games. Dr. Rady developed a scheme for comparing multiple renderings of an identical scene using different processors to verify the results of his work. The purpose

of Dr. Rady's scheme was to maintain relatively low rendering times (roughly 1 to 1.5 hours per scene) by allowing him to use the full computational power using multiple cores and threads available to him (Dr. Rady built his own workstation to carry out his rendering work), instead of using a single core and single thread which would increase the rendering times by six to nine-fold (6 to 13 hours per scene). Dr. Rady realized that the scheme he developed to compare multiple computer-rendering of identical scenes had real-world applications beyond the verification of the like-for-like rendered scenes.

25. In June 2016, Dr. Rady was hired as a senior engineer by BCG in London, UK, and assigned to BCG Digital Ventures ("BCG DV") where he was tasked with projects for two of BCG's French corporate clients. One of these projects related to vehicle toll-booth classification and another related to smart factories and cement truck routing.

26. In March 2017, Dr. Rady attended a monthly BCG DV engineers' meeting in which upcoming client engagements and the state of current client engagements and staffing are discussed. At this meeting, Dr. Rady's supervisor, Matt Sinclair ("Mr. Sinclair"), reported that BCG DV was in discussions for onboarding De Beers as a client to develop a method for establishing diamond provenance and tracking, among other things.

27. Shortly thereafter, realizing that the contemplated project for De Beers could benefit from the developments he had made during his work on physical based rendering, Dr. Rady told Mr. Sinclair about the method that he had developed for comparing identical rendered scenes., Dr. Rady explained the method, how it could be used to establish the provenance of and track diamonds and that he was considering filing a patent application. Specifically, Dr. Rady explained how 3D scan data and spectral data could be used to identify points in 3D coordinate space corresponding inclusions, occlusions, and other physical features of a diamond. Dr.

Rady further explained how a set of these points could allow for the unique identification of diamonds, and how using triplets of these points could be used to quickly trace a diamond from rough to polished. Mr. Sinclair exclaimed that Dr. Rady is "a genius" and had just "solved the problem of asset self-provenance."

28. Two weeks later, Mr. Sinclair telephoned Dr. Rady late on a Friday afternoon and told him to "bury it" and not to discuss his invention with anyone at BCG. Dr. Rady believes that he received this call from Mr. Sinclair because BCG had inked the deal with De Beers and did not want to rely on an "outside" solution for the De Beers project.

29. In April 2017, De Beers engaged the services of BCG for the ideation[9], research and development, scoping, and prototyping of hardware for the identification, authentication, and tracking of diamonds. BCG's Digital Ventures ("DV") division was assigned to the project which was given the name "Project Midnight."

30. In May 2017, Dr. Rady was assigned to work in BCG's Paris office on a project known as "Cyclope." Cyclope related to the development of an artificial intelligence and computer vision application for motor vehicle toll-booth classification and roadway accident detection in France.

31. On October 20, 2017, following a presentation by Dr. Rady about his work on Cyclope at the BCG Gamma[10] worldwide event in New York City, Andrea Gallego ("Ms. Gallego"), a Partner and Chief Technology Officer with BCG's Gamma business unit, asked Dr. Rady to join her as a co-founder for a new project known as "Source." Source is the first BCG

---

[9] BCG uses the term "ideation" to refer to the creative process of generating new ideas for clients once a client is onboarded, typically aimed at solving a client problem, and/or developing new client products or services.

[10] BCG Gamma is a subdivision of BCG whose primary focus lies in the use of artificial intelligence, machine learning and advanced data analytics to solve business problems.

branded proprietary software and involved the development of an artificial intelligence analytic engine to assist data scientists to produce production-ready computer code.

32. During his interview for project "Source", Dr. Rady advised Ms. Gallego, as well as Seshadri Iyer ("Mr. Iyer"), a Managing Director and Senior Partner at BCG Gamma, that he had invented a system and method for uniquely identifying, tracking and establishing provenance of real-world physical items (including diamonds) and would soon be filing a patent application for his invention. All of the work performed by Dr. Rady toward researching and developing this innovative system was performed outside the scope of his employment at BCG.

33. Dr. Rady accepted Ms. Gallego's offer and began his role as a senior analytics software developer working with Ms. Gallego within BCG Gamma in November 2017, in Paris, France.

34. Dr. Rady filed Provisional Patent Application No. 62/609,783 for his invention at the U.S. Patent and Trademark Office on December 22, 2017. Exhibit 3.

35. BCG DV was unable to solve the De Beers diamond identification and tracking problem after seven months of effort. Around November 2018, the BCG Gamma division was brought in to try find a solution.

36. Sometime around the beginning of January 2018, Ms. Gallego recalled that Dr. Rady had told her of his invention concerning diamond identification and tracking, and she told Dr. Rady that BCG's Project Midnight was facing significant challenges and was significantly behind schedule. Ms. Gallego urged Dr. Rady to contact Sylvain Duranton ("Mr. Duranton"), head of the BCG's Gamma business unit, stating that Dr. Rady might be able to assist with the development of a solution for De Beers given the subject matter of his

- 14 -

invention and patent application. On January 8, 2018, Dr. Rady contacted Mr. Duranton to schedule a meeting.

37. On January 9, 2018, Dr. Rady met with Mr. Duranton in BCG's offices in Paris to discuss his invention and patent application. Prior to disclosing any details of his invention and unpublished pending patent application, Dr. Rady asked Mr. Duranton to provide assurance that the technology he disclosed would be maintained in confidence by BCG. Mr. Duranton agreed that BCG would not disclose any details about Dr. Rady's invention to any third party or use the information for any purpose without Dr. Rady's consent.

38. During this January 9, 2018, meeting, Dr. Rady provided Mr. Duranton with details about his invention for uniquely and irrefutably identifying real-world physical items based on their own inherent physical and chemical characteristics (self-provenance). More specifically, Dr. Rady explained the use of 3D scan and spectral data to identify points in 3D coordinate space that correspond to inclusions, occlusions, and other physical features of each diamond and the gathering of these points into a set of triplets to generate a unique signature for each rough, cut, and polished diamond which would permit the tracing of each diamond from rough to polished. Dr. Rady explained how his invention allows for the unique identification of each rough/cut/polished diamond and definitively establishes the lineage (parent-child relationship) between a specific rough stone and the finished stones cut from that specific rough stone. Dr. Rady also explained how his invention is applicable to real-world items in other asset classes.

39. Mr. Duranton was extremely impressed and told Dr. Rady that his invention would be very valuable for many industries including the diamond industry and that Dr. Rady could likely license his technology and invention to a number of third parties. Dr. Rady agreed with Mr.

Duranton and said that he would be interested in a licensing relationship to help BCG advance the De Beers project. Mr. Duranton told Dr. Rady that he would advise Arun Ravindran ("Mr. Ravindran"), a Partner and Associate Director at BCG Gamma, and Romain De Laubier ("Mr. De Laubier"), a Managing Director and Partner at BCG Gamma, who were leading the Gamma team assigned to Project Midnight, to contact Dr. Rady to discuss BCG's possible licensing of his technology and invention for Project Midnight.

40. On January 16, 2018, in two separate publications, Mr. Bruce Cleaver ("Mr. Cleaver"), Chief Executive Officer of De Beers Group, admitted the difficulties De Beers was having solving the problem of how to digitally track diamonds and link a polished diamond back to the rough stone from which it was derived, noting that "rough diamonds can be cut into multiple polished stones" and that De Beers hadn't yet worked out how to ensure the same stone is digitally tracked, saying "**We've spent a lot of time thinking about how you can triangulate the polished back to the rough . . . That's the area that's going to require the most amount of work,**"[11] and "**tracking a cut and polished stone back to its original source is one of the hurdles that De Beers has yet to surmount**."[12] However, miraculously less than two months of BCG receiving Dr. Rady's then unpublished patent application, Project Midnight was completed, and De Beers was able to track and trace the lineage of rough and polished diamonds from mine to finger.

41. Between January 18, 2018, and February 6, 2018, Dr. Rady had numerous meetings, email exchanges, and phone calls with Mr. Ravindran in which:

---

[11] See Exhibit 4.

[12] https://www.proactiveinvestors.co.uk/companies/news/190117/de-beers-pilots-blockchain-scheme-to-track-provenance-of-diamonds-190117.html

- Mr. Ravindran contacted Dr. Rady to discuss how BCG could use his invention for the De Beers project Exhibit 5, and Dr. Rady repeated the description he provided to Mr. Duranton regarding his invention, using 3D scan data and spectral data to identify points in 3D coordinate space that correspond to inclusions, occlusions, and other physical features of each diamond, determining a series of triplets of those points and using those points and triplets as a unique identification for each rough/cut/polished diamond and for definitively establishing the lineage (parent-child relationship) between a specific rough stone and the finished stones cut from that specific rough stone.

- Mr. Ravindran asked Dr. Rady to send him a copy of his patent application by email (which, at the time, had yet to be published), reiterating the earlier promises made by Mr. Duranton that his invention would be kept confidential and not used without Dr. Rady's permission. Exhibit 6.

- Knowing that BCG was behind schedule and under the gun and did not have 3D scanners and spectral imaging cameras at hand, Dr. Rady also explained to Dr. Ravindran that for an inexpensive proof-of-concept, a rudimentary 3D model of a rough stone could be generated using a 3D scan. Dr. Rady explained that the resulting 3D model could then be used to generate a set of enhanced 2D silhouettes from which a data set of geometric shapes could be extracted, representing boundary contours of the diamond. Dr. Rady explained that the obtained data set could then be compared to a reference data set to confirm whether the reference data was from the same stone using any one of several shape similarity methods to

compute similarity between the two sets of data. Dr. Rady explained to Mr. Ravindran that all of the details for accomplishing this rudimentary proof of concept was set forth in a 2008 paper entitled "Shape Complexity from Image Similarity," which Dr. Rady gave to Mr. Ravindran via email. While the Shape Complexity paper starts the process by making a first set of Silhouettes, Dr. Rady explained that this step was unnecessary if a 3D scanner was available for generating the 3D model. Dr. Rady explained to Mr. Ravindran, however, that this rudimentary proof of concept would only work for re-identification of rough stones and could not be used to identify whether a finished stone was cut from a particular rough stone.

- Mr. Ravindran asked what kind of arrangement Dr. Rady would like in exchange for BCG using his inventions for Project Midnight. Dr. Rady reiterated what he told Mr. Duranton saying that he would be interested in a licensing relationship to help BCG advance the De Beers project.

42. On January 18, 2018, in reliance on Mr. Ravindran's assurances that BCG would maintain the confidentiality of Dr. Rady's patent application and not use any aspect of it without his permission, Dr. Rady provided a copy of his patent application to Mr. Ravindran. Exhibit 6. In complete betrayal of his assurances to Dr. Rady, Mr. Ravindran immediately circulated Dr. Rady's unpublished patent application throughout BCG via email to promote Dr. Rady's invention as a solution to BCG's client projects relating to traceability, provenance, asset tracking, anti-counterfeiting, supply chain management and simulation. See ¶58, below.

43. Following BCG's receipt of Dr. Rady's patent application, BCG and De Beers obtained 3D scan data from Sarine Technologies ("Sarine")[13] for a handful of diamonds, scanned those diamonds using spectrometers at a London university, used the 3D scan data and spectral data to identify points in 3D coordinate space that correspond to inclusions, occlusions, and other physical features of each diamond, and to determine a series of triplets of those points to generate a unique identification of each rough/cut/polished diamond which could be used to establish the lineage (parent-child relationship) between a specific rough stone and the finished stones cut from that specific rough stone, constituting the first instance of what became known as Stone ID, verifying the operability of Dr. Rady's invention.

44. In March 2018, BCG created "The Fifty Five Foundry, Inc." ("55 Foundry")[14] to exploit Dr. Rady's invention, later branded as Tracr (the name given by BCG and De Beers to Dr. Rady's invention). Mike Schwartz, a BCG Partner, a key member of Project Midnight, and newly tapped to head 55 Foundry together with BCG Partner Jeff Schumacher,[15] characterized Tracr (Dr. Rady's invention) as a "pan-industry" solution for asset identification, authentication, tracking, provenance, tokenization and fractionalization. Within 55 Foundry, the effort to exploit Dr. Rady's invention was named the "Origyn Project." In July 2020, BCG established Origyn Research USA, LLC to use Dr. Rady's invention for the development of a device specifically for authenticating second-hand luxury goods, collectables, artwork, and other assets. In August 2020, BCG established Origyn Foundation to promote Dr. Rady's invention

---

[13] Sarine develops equipment for planning, processing, and grading of diamonds, to determine how to best plan and cut a rough diamond into one or more cut and polished stones.

[14] https://www.youtube.com/watch?v=lcLTP2DDTvA

[15] At the time, Chief Executive Officer and Founder of BCG Digital Ventures where Project Midnight originated.

for the authentication of second-hand luxury goods, collectables, artwork, and other assets. [16] In November 2022, 55 Foundry changed its name to NAX Group, NAX standing for "New Asset Exchange."[17] In July 2023 and November 2024, Mike Schwartz formed the Pan Industrial Companies as additional vehicles to commercialize Dr. Rady's invention.[18]

45. In short, after BCG and De Beers had completed Project Midnight and launched Tracr using Dr. Rady's invention, BCG began leveraging Dr. Rady's invention across a host of industries, forming entity after entity. Indeed, many of the BCG personnel that worked on Project Midnight also became associated with the BCG ventures 55 Foundry, Origyn, Pan Industrial, and NAX Group, including Mike Schwartz, Deepak Gopalakrishna, Henning Diedrich, Rick Porter, David Phan, Farshad Kheiri, Tianyi Li, Austin Fatheree, Peter Borah, and Kevin Seagraves.

46. In the meantime, in March 2018, Dr. Rady spoke with a representative of Rio Tinto, Plc ("Rio Tinto"), one of the largest metal and mining corporations in the world, about potentially licensing his invention. Dr. Rady informed Ms. Gallego of this potential licensing opportunity, who then introduced Dr. Rady to Sophie Pradere ("Ms. Pradere"), Senior Legal Counsel with BCG. Ms. Pradere strongly suggested that Dr. Rady not pursue discussions with Rio Tinto as it might interfere with BCG's relationship with De Beers and the ongoing discussions regarding the use of Dr. Rady's invention for Project Midnight. Based on Ms. Pradere's direction, Dr. Rady did not pursue discussions with Rio Tinto.

47. On May 10, 2018, De Beers announced the launching of Tracr. In that announcement, De

---

[16] https://www.youtube.com/watch?v=2r5qQBKAHHU

[17] NAX Group was led by Jeff Schumacher.

[18] https://www.youtube.com/watch?v=XZDmLJlJHCw

Beers proclaimed that "[a]s the diamonds travel along the value chain, a unique Global Diamond ID is automatically created on Tracr… This allows Tracr to consolidate the data into an immutable digital trail for each physical diamond, assuring its provenance and traceability from rough to polished." De Beers' then-CEO, Bruce Cleaver, added "[t]he Tracr project team has demonstrated that it can successfully track a diamond through the value chain, providing asset-traceability assurance in a way that was not possible before." Exhibit 7.

48. The "Tracr project team" referred to in the De Beers announcement was in fact the Project Midnight Team[19], while the "Global Diamond ID" and "Tracr" are Dr. Rady's invention, finally solving the problem that De Beers and BCG had struggled with until misappropriating and using Dr. Rady's invention without his permission.

49. On May 11, 2018, immediately upon learning of the De Beers announcement of Tracr, Dr. Rady confronted Mr. Ravindran, pointing out that Tracr was a direct misappropriation of the invention he had disclosed to Messrs. Duranton and Ravindran on their repeated assurances that it would not be disclosed or used without his permission. Mr. Ravindran once again asked Dr. Rady whether he would be willing to license his invention to BCG, to which Dr. Rady once again stated that he would be interested in a licensing relationship. During this conversation, Mr. Ravindran revealed that BCG and De Beers were working on a patent application specific to Tracr. When Dr. Rady objected, Mr. Ravindran said "what if [BCG] just file[s] for identification and re-identification of diamonds in certain

---

[19] The BCG personnel staffed on Project Midnight included: Arun Ravindran, Roman De Laubier, Amine Benayad, Amine Bouamama, Mike Schwartz, Mark Zaleski, Mathias Tauber, Deepak Gopalakrishna, Henning Diedrich, Alison Rushworth, Jan Philipp Bender, Philip Hoerning, Xiao-Xiao J. Zhu, Raju Sarma, Junius Ho, Rick Porter, David Phan, Farshad Kheiri, Tianyi Li, Austin Fatheree, Peter Borah, Kevin Seagraves, and Sergey Sushentsev. The De Beers personnel that provided direct oversight on Project Midnight included Bruce Cleaver (currently Senior Advisor, BCG), Neil Ventura (currently Expert Advisor, BCG), Feriel Zerouki and David Prager.

jurisdictions?" Dr. Rady made clear to Mr. Ravindran that he would consider this to be an illegal theft of his intellectual property.

50. Between May 14, 2018, and May 24, 2018, Dr. Rady had several meetings and communications with Ms. Gallego, Messrs. Duranton, Ravindran, De Laubier, and Ms. Pradere in which:

- Dr. Rady continued to raise his concerns regarding the fact that Tracr had been taken directly from the invention he had disclosed to Messrs. Duranton and Ravindran in confidence.

- Dr. Rady raised his concerns about the dissemination of his invention throughout BCG and demanded that his concerns be resolved before any further dissemination or use of his invention, including at a BCG global meeting planned for June 2018 in which BCG intended to present Tracr.

- On May 14, 2018, in response to an email sent by Dr. Rady reiterating his concerns about the use of his invention without his permission in Tracr, Mr. Ravindran stated "**Gamma work on Tracr is limited to StoneID – to create rough/polished signatures to identify rough, polished and rough-to-polished. In other words, our work is on stone geometry, 3D modeling and spectroscopy….we need to formalize how to use your patent pending work for Tracr**." Exhibit 8.

- Ms. Gallego also sent an email to BCG legal [Ms. Pradere], saying "**as you know, Max [Dr. Rady] has a provisional patent under his own name…The application of his work can help us in a lot of client cases, Max [Dr. Rady] does not want to give up all the rights of his work to**

**BCG and wants to retain ownership…We could do something where BCG would have full exclusivity of that license against competitors."** Exhibit 9.

- Mr. Ravindran repeatedly asked Dr. Rady if he would be interested in licensing his invention for Tracr. Dr. Rady repeatedly replied that he would indeed be interested in licensing his invention for Tracr so long as he was properly compensated.

- Mr. Duranton, in an attempt to appease Dr. Rady, offered to set up a BCG standalone business unit for asset provenance and tracking to be funded by B-Capital (the funding arm for BCG) and install Dr. Rady as its global head.

- Ms. Gallego informed Dr. Rady that his concerns regarding the unauthorized use of his invention in Tracr were a top priority at the highest levels of BCG and that BCG was exploring the possibility of licensing Dr. Rady's patent. Exhibit 10.

- Ms. Gallego informed Dr. Rady that BCG legal counsel had conducted an investigation and confirmed that Dr. Rady had no connection with, or exposure to, Project Midnight, confirming that Dr. Rady's invention had not been developed in the course of his employment with BCG. Exhibit 11.

51. Meanwhile, on May 22, 2018, Shervin Khodabandeh ("Mr. Khodabandeh"), a Managing Director and Senior Partner at BCG Gamma sent an email to BCG Gamma's global distribution list (approx. 600 employees globally), attaching a slide (Exhibit 12) shown at

- 23 -

the BCG Gamma World-Wide meeting in Paris describing the Tracr platform solution in detail. This slide shows how Tracr uses 3D ("shape") data and spectral analysis to map anomalies, sets of triplets and the relative distances of the inclusions to produce a gemstone's unique "fingerprint" or "Stone ID" allowing for rough-to-rough, polished; and rough-to-polished matching – identical in all material respects to Dr. Rady's invention which he disclosed to BCG, and which was the subject of his then-pending patent application.

52. On June 1, 2018, at the JCK Conference in Las Vegas, De Beers hosted a panel discussion on the benefits of Tracr. Alrosa, De Beers, BCG, Venus Jewel, Signet and Sarine all participated in the panel discussion.[20] Not coincidentally, shortly after being exposed to Dr. Rady's invention by De Beers and BCG (See ¶43, above), Sarine went on to promote and sell a diamond traceability solution, called Sarine Diamond Journey Traceability. The head of De Beers' Tracr, the CEO of Sarine, and the CEO of GCAL (a Sarine US subsidiary) confirmed that Sarine's Diamond Journey Traceability is identical to Tracr.[21]

53. On June 29, 2018, in an interview, Deepak Gopalakrishna ("Mr. Gopalakrishna"), Principal and Director of Product Management at BCG DV, a key member of Project Midnight, and simultaneously holding the position of General Manager of Tracr, described the novelty and inventiveness of the Tracr solution which he says solves all of the problems required for diamond identification, tracking and provenance:

> "to track a diamond throughout the value chain, you need to solve three distinct problems: You must determine the characteristics that uniquely identify a piece of rough; you must do the same for a piece of polished; and the most challenging, you

---

[20] https://www.linkedin.com/feed/update/urn:li:activity:6409414819958575104/

[21] https://www.youtube.com/watch?v=11DAWEjwdrg; the video shows the scanning process and mapping of physical features and sets of triplets.

**must be able to match the piece of polished with the rough it comes from. All three problems have different solutions that utilize different characteristics...We have working solutions to all three.**"[22]

The "working solutions" to which Mr. Gopalakrishna was referring was Dr. Rady's invention which BCG and De Beers turned into Tracr.

*BCG pressures Dr. Rady to relinquish his claims against BCG and De Beers*

54. Immediately after Dr. Rady raised his concerns in May 2018 about the misappropriation of his intellectual property and its use without his permission in the Tracr solution, BCG legal relentlessly questioned Dr. Rady on how he came up with his invention, the scope of his studies and whether he had any exposure to project Midnight, claiming that the purpose of their inquiries is to determine how to include a commercial patent deal for Dr. Rady into the De Beers arrangement. Exhibit 13

55. On June 29, 2018, BCG summoned Dr. Rady to a meeting in London under the guise of resolving his dispute regarding the misappropriation of his intellectual property and its use without his permission in the Tracr solution. In this meeting, attended by Messrs. Duranton and Ravindran (attending by video), BCG internal counsel Ms. Pradere, and BCG external counsel from the law firm Fieldfisher, BCG's lawyers tried to intimidate Dr. Rady into giving up his claims of unauthorized use of his invention, asserting that his invention was not patentable (notwithstanding that BCG and De Beers were already preparing a patent application claiming Dr. Rady's invention as theirs), and that he should lower his sights and expectations. Not able to convince Dr. Rady to drop his contentions, Mr. Duranton suggested that Dr. Rady make a presentation regarding his invention to the head of BCG Innovation in

---

[22] https://www.jckonline.com/editorial-article/tracr-de-beers-blockchain-platform/?utm_source=JCK+News+Daily&utm_campaign=c2af7dc9d3-EMAIL_CAMPA%E2%80%A6

Atlanta for the purpose of evaluating the possible licensing and further exploitation of Dr. Rady's invention by BCG on behalf of itself and its clients.

56. On July 19, 2018, Ms. Pradere sent by email to Dr. Rady an agreement on BCG letterhead titled "Agreement BCG INNOVATION _ Max Rady - 19 July 2018" and requested that he sign this agreement as a prerequisite to a meeting with the entire BCG Innovation team. The proposed agreement required Dr. Rady to: (i) falsely agree that BCG had maintained the confidentiality of his then unpublished Provisional Patent Application No 62/609,783; (ii) waive his legal rights to initiate legal action against BCG and De Beers for using his invention without his permission and (iii) prevent him from disclosing his invention to third parties, effectively giving BCG exclusive rights to his invention and depriving him of the ability to practice and commercialize his invention. Exhibits 14 & 15. Dr. Rady refused to sign the agreement.

57. On August 15, 2018, Dr. Rady met Ms. Gallego in BCG offices in Boston, MA, for Dr. Rady's performance review meeting. BCG inhouse counsel Ms. Pradere was surreptitiously listening to the conversation through Ms. Gallego's computer. During the meeting, Ms. Gallego told Dr. Rady that his dispute with BCG regarding the unauthorized use of his invention was negatively impacting his reputation inside BCG and hindering his opportunities to work on some new and highly important projects. Ms. Gallego also confirmed that BCG and De Beers would be filing a patent application for identification of diamonds despite the concerns raised by Dr. Rady regarding the unauthorized use of his invention in Tracr. Dr. Rady reiterated to Ms. Gallego what he told Mr. Ravindran in May 2018, that BCG and De Beers filing a patent application claiming his invention as theirs would be considered illegal theft of his intellectual property.

58. On August 16, 2018, while Dr. Rady was in BCG offices in Boston, MA., Ms. Gallego told Dr. Rady on BCG's internal SLACK messaging platform that **"Sesh [Mr. Iyer] just got sent some stuff that may make his head explode,"** Exhibit 16, and requested that Dr. Rady meet her on the eleventh floor of BCG offices so she can share with him offline what Mr. Iyer received. Ms. Gallego shared with Dr. Rady an email chain with numerous email attachments showing, among other things, 1) that a second internal BCG investigation confirmed that there was "significant overlap" between Tracr and Dr. Rady's invention, 2) that Dr. Rady was not exposed to the De Beers' Project Midnight, with one email in the chain stating, "doesn't seem he [Dr. Rady] touched the codebase either;" and 3) that (contrary to the provisions of the draft agreement that BCG's lawyers presented to Dr. Rady on July 19, 2019) Mr. Ravindran had shared Dr. Rady's unpublished patent application globally with BCG employees to advance Project Midnight and other BCG corporate clients' projects immediately after receiving it from Dr. Rady. Ms. Gallego told Dr. Rady that following this internal investigation, Darren Braham ("Mr. Braham"), Legal Counsel BCG, recommended terminating Dr. Rady because, according to Mr. Braham, if Dr Rady were to discover the magnitude of BCG's unauthorized use of his IP/invention in numerous BCG's corporate clients' projects and ventures, he could sue and "**obliterate**" BCG.

59. During the month of September 2018, Ms. Gallego continued to pressure Dr. Rady to release his claims against BCG, saying that his claims against BCG were threatening his continued employment, revealing nevertheless a) that BCG's lawyers had concluded that Max's claims were legitimate, b) that the intellectual property belonged to Dr. Rady, c) that BCG was not going to take a license from Dr. Rady, d) that no one at BCG was going to admit culpability, and e) that BCG and De Beers were preparing a competing patent application. These conversations included the

following communication on BCG's internal SLACK messaging platform:

"I want to talk to you about this legal stuff, it needs to end

so I just need to know what you need to be happy and meet BCG in the middle

I don't see an end in sight and it's not getting better

so maybe take the weekend to see what it is you want here as an employee vs all the legal crap

. . .

the IP license isn't gonna happen

. . .

no one is going to get fired or admit to any breach

. . .

I told Sophie [Ms. Pradere] I would just let you file your patent, part ways with this IP stuff and when your patent is filed, let the cards land where they may

she [Ms. Pradere] said that they [BCG lawyers] admit it's totally your IP not part of BCG

. . .

BCG lawyers see no breach there is no patent yet or proof of infringement

Just to be clear so I don't confuse Sophie's words

And she has said there is no poof to say otherwise

- 28 -

**And our external counsel has said the same**

**And no overlap with the other patent"**

Exhibit 17.

60. Ms. Gallego's reference to "**the other patent**" was to the patent application that BCG and De Beers were drafting that claimed Dr. Rady's invention with a focus on re-identification of rough gemstones.

61. On September 26, 2018, Dr. Rady, through counsel, sent a cease and desist letter to BCG requesting BCG and its various business units to immediately cease any and all further disclosure and exploitation of the invention developed by Dr. Rady, including through De Beers and any other client or third party with whom Dr. Rady's invention was shared or used in breach of BCG's obligation of confidentiality.

62. On October 4, 2018, Dr. Rady received exemplary comments for his annual review. In particular, Ms. Gallego stated that "one [Dr. Rady] of the brightest engineers I've ever worked with…he built the first version of our [BCG] software [Source] by himself….*the combination of [Dr. Rady's] work ethic and intelligence is inspiring; … [he provides] outstanding contribution, consistently exceeds expectations; … [and] exemplifies BCG's core values….*"

63. On October 31, 2018, notwithstanding an exemplary review a few weeks earlier, BCG terminated Dr. Rady's employment. Dr. Rady's employment was terminated because of the concerns he raised regarding BCG and De Beers' misappropriation of his invention and his refusal to give up his claims of unauthorized use of his invention by BCG and De Beers.

64. On July 4, 2019, a BCG presentation identified Tracr as a portfolio asset of BCG.[23]

65. On November 5, 2019, Dr. Rady's first U.S. patent was granted, U.S. Patent No. 10,469,250 (the '250 patent). Exhibit 18. Dr. Rady immediately filed a first continuation patent application to pursue additional claims for his invention. Later, Dr. Rady filed second, third and fourth continuation patent applications, each of which has matured into a U.S. Patent. Dr. Rady's two continuation patents, U.S. Patent 12,401,496 and U.S. Patent 12,580,734, are the subject of this lawsuit. Exhibits 1 and 2. Dr. Rady has already filed fifth and sixth continuation applications which are now pending. Dr. Rady has also obtained patents in numerous other countries and regions, including Canada, Japan, China, Belgium, Switzerland, Germany, France, United Kingdom, Italy, Monaco, Netherlands, Turkey, Russia, Australia, South Africa and the African Regional Intellectual Property Organization (ARIPO).[24]

*A Project Midnight Team Member Contacts Dr. Rady to Confirm BCG's and De Beers' Patent Infringement and Misappropriation of Dr. Rady's Invention*

66. In mid-November 2019, Dr. Rady posted on his LinkedIn account that on November 5, 2019, the United States Patent and Trademark Office (the "USPTO") issued his first patent.

67. On December 30, 2019, Dr. Rady received on LinkedIn a message from an anonymous individual claiming to be a developer at BCG DV and a collaborator on the Project Midnight team, indicating that he/she, as well as others on Project Midnight believed that critical information provided to them during development of Tracr had been misappropriated from

---

[23] https://www.youtube.com/watch?v=u5VJFHzCuvY

[24] ARIPO member states include Botswana, Gambia, Ghana, Kenya, Liberia, Malawi, Zimbabwe, Sierra Leone, Mauritius, Mozambique, Namibia, Tanzania, Uganda, Zambia, Rwanda, Seychelles, Somalia, Sudan, Kingdom of Lesotho, Cabo Verde, Kingdom of Eswatini and São Tomé and Príncipe.

Dr. Rady's then unpublished patent application and stated that he/she filed a complaint on the Anglo American speak-up hotline (https://www.speak-up-site.com/) on November 25, 2018. Specifically, this individual stated in his/her message:

> Hi, Max.
>
> Congratulations on your patent. Most of us at the office in London saw your LinkedIn post and we are happy for you but are unable to comment on it for job security and this is why this profile is not my real name. The post confirmed what most of us suspected last year when you left BCG that your patent was used in Midnight. I was one of the collaborators on Midnight and I and others sensed something odd last year after you left and were uncomfortable because management told us to keep quiet and carry on. I complained online anonymously to the Anglo-American speak up hotline (https://www.speak-up-site.com/) on 25 November 2018 because I wanted De Beers to know that BCG nicked your patent. The complaint reference is – 20181125065607. I reported in the hotline how Midnight was behind and in the beginning of 2018 the project team received technical information from Deepak regarding ideas for stone identification and tracking and through the use of this information we achieved several project milestones. We found out later that you disputed with BCG about the use of your patent without your permission and were terminated. There are rumors that you made a claim against BCG so I wish you good luck.

Exhibit 19.

68. This individual also provided Dr. Rady with a screen shot of the confirmation number for the complaint on the speak-up hotline of Anglo American:

- 31 -

**Submit-A-Report-Success**

Thank you. Your report was submitted successfully!
Your reference number is: 20181125065607

Please remember your reference number in order to track its status using the "Receive Feedback" page on this website.

Return home

Exhibit 20.

69. On March 13, 2020, Dr. Rady filed his first patent infringement lawsuit against De Beers and BCG in the Southern District of New York. De Beers and BCG moved to dismiss Dr. Rady's complaint asserting that claim 1 of the '250 patent was invalid under 35 U.S.C 101 for being directed to "an abstract idea." The court held in favor of De Beers and BCG. Dr. Rady appealed the district court's decision to the U.S. Court of Appeals for the Federal Circuit where the district court's decision was affirmed on March 27, 2024.

70. In the meantime, as noted above, Dr. Rady had filed several continuation patent applications. Following the March 27, 2024, Federal Circuit decision, Dr. Rady amended the claims of his still pending patent applications to define his invention in a way that would not reasonably be characterized as an abstract idea. Two of those continuation patents, U.S. Patent 12,401,496 ("the '496 patent") and U.S. Patent 12,580,734 ("the '734 patent"), are the subject of this Complaint. Exhibits 1 and 2.

71. As stated above, shortly after learning that Dr. Rady's invention solved the diamond traceability problem, BCG began working with De Beers to draft a patent application disclosing and claiming subject matter invented by Dr. Rady and disclosed by Dr. Rady to Mr. Ravindran in January 2018.

72. On information and belief, De Beers gave to an individual named "Qi He Hong" Dr. Rady's patent application, the application that De Beers and BCG had drafted together in early

- 32 -

2018, and the Shape Complexity paper that Dr. Rady had given to Mr. Ravindran, and asked Qi He Hong to work up one or more patent applications and patent claims that could be used to cover all or parts of the Tracr solution, effectively asking Qi He Hong to write one or more patent applications and claims for Dr. Rady's invention. On information and belief, Qi He Hong complied with this request and ultimately prepared four patent applications entitled, respectively, "Re-identification of Rough Gemstones," "Gemstone Planning," "3D Modeling of Rough Gemstones," and "Measurement of Rough Gemstones." Together, these patent applications disclose little more than what Dr. Rady had disclosed to BCG in early 2018. With these four patent applications, taken directly from Dr. Rady's disclosures to BCG, De Beers was illegitimately and surreptitiously attempting to secure a patent monopoly on Dr. Rady's invention and Tracr.

73. All four of the applications drafted by or on behalf of Qi He Hong were filed in the UK patent office in June 2019. Roughly one year later, three of them were filed as PCT (Patent Cooperation Treaty) applications in the European Patent Office in May 2020, and two of them ("Re-identification of Rough Gemstones" and "Gemstone Planning") were eventually filed in the U.S. in December 2021. Both of the applications filed in the U.S. were granted. A continuation application from the "Re-identification of Rough Gemstones" patent was filed, and a third patent was granted. The two De Beers patents entitled "Re-Identification of Rough Gemstones," U.S. Patent No. 11,893,809 and U.S. Patent No. 12,354,384, Exhibits 21 and 22, respectively, are the subject of the correction of inventorship claims asserted herein.[25]

---

[25] Dr. Rady does not claim to have invented the subject matter claimed in the De Beers "Gemstone Planning" U.S. Patent No. 12,117,403 because, while the hardware that is disclosed and claimed is identical to Dr. Rady's invention, Dr Rady does not claim to have conceived of the use of his invention for "Gemstone Planning," i.e., determining how best to cut a rough diamond into one or more cut and polished stones.

74. Specifically, on June 20, 2019, De Beers UK Limited filed a patent application entitled "Re-Identification of Rough Gemstones" in the UK patent office, incorrectly/falsely naming Qi He Hong as the sole inventor and failing to correctly name Dr. Rady as the true inventor of the claimed invention.

75. Qi He Hong did not conceive or contribute to the conception of the invention described and claimed in the De Beers patent application. Rather, he wrote the "Re-Identification of Rough Gemstones" patent application based on information he received from De Beers, which De Beers received from BCG, and which BCG received from Dr. Rady, adding nothing of his own conception.

76. On December 17, 2021, while Dr. Rady was litigating his claims of the misappropriation of his invention by BCG and De Beers, De Beers UK Limited filed the "Re-Identification of Rough Gemstones" patent application in the U.S., as serial number 17/620,477, also incorrectly/falsely naming Qi He Hong as inventor and failing to correctly name Dr. Rady as the true inventor of the subject matter claimed. U.S. Patent Application serial number 17/620,477 issued into U.S. Patent No. 11,893,809 (the '809 patent), on February 26, 2024, incorrectly/falsely naming Qi He Hong as the sole inventor and failing to correctly name Dr. Rady as true inventor of the subject matter claimed.

77. On January 4, 2024, just before the '809 patent was to issue, De Beers UK filed a continuation patent application in the U.S., as serial number 18/404,570, again incorrectly/falsely naming Qi He Hong as inventor and failing to correctly name Dr. Rady as the true inventor of the subject matter claimed. U.S. Patent Application serial number 18/404,570 issued into U.S. Patent No. 12,354,384 (the '384 patent) on July 8, 2025, incorrectly/falsely naming Qi He Hong as the sole inventor and failing to correctly name Dr.

Rady as true inventor of the subject matter claimed.

78. All of the elements of the claims of the '809 and '384 patents were first conceived by Dr. Rady and disclosed by him to Mr. Ravindran. See Exhibit 23 and Exhibit 24 matching the claims of the '809 and '384 patents, respectively, to Dr. Rady's disclosures of his invention and an inexpensive proof-of-concept to Mr. Ravindran. Mr. Ravindran and BCG disclosed Dr. Rady's invention to De Beers, and De Beers asked Qi He Hong to prepare one or more patent applications directed to Dr. Rady's invention.

79. The '809 and '384 patents claim certain elements of Tracr. The '809 and '384 patents were filed more than one year after the commercial release of Tracr. Although De Beers was well aware of Dr. Rady's patent application and of Tracr, De Beers did not disclose Tracr or Dr. Rady's patent application to the USPTO.

80. Meanwhile, on February 27, 2020, Forbes included De Beers on its annual Forbes Blockchain 50 recognizing enterprises embracing blockchain technology. "To qualify, Blockchain 50 members must be generating at least $1 Billion in revenue annually or be valued at $1 Billion or more." In particular, Forbes indicated that Tracr "follows diamonds, which have undergone 3-D scans, as the gems are mined, cut, polished and sold. Already more than 30 participants, including Signet Jewelers – owner of Kay, Zales, Jared and Blue Nile – have signed on. Tens of thousands of stones are being registered per month."[26]

---

[26] https://www.forbes.com/sites/michaeldelcastillo/2020/02/19/blockchain-50/

- 35 -

81. On April 30, 2020, Jim Duffy ("Mr. Duffy"), head of De Beers' Tracr platform, compared the Tracr solution to the industrial revolution in terms of connecting the digital and physical worlds to create connected value chains.[27]

82. On June 17, 2020, in an online Tracr Community Briefing presentation, Mr. Duffy and Michillay Brown, Industry Transformation Lead of De Beers' Tracr, said that De Beers was exploring the use of Tracr beyond the diamond industry and that it was working closely with its parent Anglo American to use a version 2-3 of Tracr for platinum, iron ore and nickel traceability. See, Rady v. BCG, et al. Complaint Video Folder Hyperlink, June 17, 2020 Tracr Community Briefing video @44:00.

83. On July 6, 2020, Mr. Duffy and Michillay Brown, reiterated the use of Tracr beyond the diamond industry and said that it is equally important to prove to the customer that the entire diamond ring (the diamond and the metal it is mounted on) is ethically sourced and since Anglo American is the world's largest producer of platinum, a version of Tracr (which later became known as "Valutrax") would be used to track platinum which would be hosted on a different blockchain ledger and the customer would receive two IDs, one for the diamond and one for the platinum, verifying the provenance and ethical sourcing of the diamond and the metal.[28]

84. On October 15, 2020, PricewaterhouseCoopers (PwC) listed Tracr, "used by De Beers Group to verify the authenticity and origin of diamonds," as one of the top use cases for blockchain

---

[27] https://www.youtube.com/watch?v=erO-de7hQ3I

[28] https://www.youtube.com/watch?v=fbWC5o3mpw4

for provenance. In its report, PwC expected the "implementation of provenance systems such as Tracr to account for a \$962B USD boost to global GDP by 2030."[29]

85. In a study published by De Beers in its 2021 Diamond Inside Report, 85% of consumers surveyed indicated that they would be willing to pay an average premium of 15% for a tracked diamond that is guaranteed to be both legitimate and ethically sourced.[30]

86. In August 2020, BCG established Origyn Foundation to promote Dr. Rady's invention for the authentication of second-hand luxury goods, collectables, artwork, and other assets.[31] In March 2022, Origyn Foundation promoted itself as having a team that is distributed across the globe, specifically including Texas, and advertised itself as built for customers of top brands and fashion houses as well as leading resellers, bringing guaranteed authenticity to original and pre-owned luxury items, enabling customers to authenticate and trace lifetime ownership of valuable objects.[32] In an April 2022 interview, Chairman and co-founder of Origyn Foundation, Mike Schwartz described Origyn Foundation as having a global footprint, stating that he works with a group of people spread around the world in every continent except for Antarctica to identify and authenticate objects using robots and desktop machines.[33] Mike Schwartz said that Origyn has a minting engine and that Origyn is minting digital twins of many thousands of items with industry leaders in both primary and secondary

---

[29] https://www.securities.io/pwc-forecasts-major-blockchain-adoption-identifies-top-use-cases/

[30] https://www.debeersgroup.com/~/media/Files/D/De-Beers-Group-V2/documents/reports/insights/2021/2021-the-diamond-insight-report.pdf

[31] https://www.youtube.com/watch?v=2r5qQBKAHHU

[32] https://assets-global.website-files.com/63da765ff48ebc20ed30d7b2/642c50339fb5252801cd7bc8_d0YjQxku5K5S7tbTGWa8hPjVuuxc3T9kqcO0Bp8T78I.pdf

[33] https://www.youtube.com/watch?v=Kwa7keyCkUA

markets. Id. Asked to discuss Origyn's authentication platform, Mike Schwartz repeatedly referred to Tracr as a pan industry solution that was built for the diamond industry, adding that Origyn is expanding the platform to different asset classes and industries, and that Origyn has identified industry leaders in key industry sectors that can bring market volume and inventory to Origyn's platform. Id. Mike Schwartz noted further that Origyn has signed major players in luxury goods with initial focus on luxury watches, and that since these conglomerates work across watches, handbags, jewelry and fashion, Origyn has been quickly introduced to other asset classes. Id. In a June 2022 interview, Vincent Perriard, Co-Founder of Origyn Foundation, said that Origyn Foundation employs 74 people at its main location in Manhattan Beach, California, 25 employees in Switzerland, and 8 employees in an office in Ukraine.[34] In November 2022, Origyn Foundation attended the Re-Luxury Event in Geneva Switzerland, a trade show that focuses on the secondary (second-hand) luxury industry. At the event, Origyn Foundation demonstrated use of the Origyn Minting Box and released a video entitled "For the first time in history, an object itself becomes its own proof of authenticity."[35]

87. In July 2023 Mike Schwartz formed the first of several new companies sharing the name "Pan Industrial". In February 2024, Origyn Foundation announced that in response to increasing demand from many different industry sectors wishing to make use of the Origyn protocol, Origyn is introducing its Certified "Integrator" Model, anointing "**Pan Industrial**" as a Certified Origyn Integrator. In the announcement, Mike Schwartz, Co-Founder of both Origyn and Pan Industrial, is quoted as saying: "In order to effectively scale industry's use

[34]    https://www.heidi.news/explorations/dix-acteurs-majeurs-de-la-crypto-en-suisse-romande/des-nft-biometriques-pour-garantir-l-authenticite-des-objets-de-luxe

[35] https://www.linkedin.com/feed/update/urn:li:activity:7006732331369598976/

of the ORIGYN Protocol's services and fully realize its growth potential, it has become necessary to leverage ORIGYN-certified system integrators who possess the bandwidth and skills to service industry participants in their quest to leverage ORIGYN's Web 3.0-based Real World Asset ("RWA") infrastructure." Origyn's Web 3.0-based RWA infrastructure requires the use of an infringing scanning machine to authenticate real world objects.

88. On April 30, 2021, Dr. Rady established Tachyon Impact Solutions S.A.R.L. ("Tachyon") for the purpose of commercializing his invention. Within the next thirty (30) days, Tachyon will exit its preparatory "stealth mode" and launch its products and services to the *diamond*, luxury, FinTech/insurance (fractionalization and tokenization), and manufactured goods (aerospace, automotive, oil and gas, pharmaceutical) markets.

**Dr. Rady's U.S. Patent No. 12,401,496**

89. Dr. Rady is the inventor and current owner of the '496 patent.

90. Dr. Rady's U.S. Patent No. 12,401,496 duly and legally issued on August 26, 2025

91. Dr. Rady exclusively owns all rights, title, and interest in the '496 patent, including the right to bring this action and to recover past and future damages for Defendants' infringement of the '496 patent.

92. *Defendants are not and have never been licensed to practice Dr. Rady's '496 patent.*

93. The '496 patent is valid and enforceable.

94. Claim 1 of the '496 patent recites:

A system comprising
one or more processors,
a spectral imaging camera,

a laser range scanner,

a light source,

a non-transient computer-readable memory and

a connection to a computer network,

said non-transient computer-readable memory containing computer-readable

instructions which when executed by said one or more processors cause

said one or more processors to:

use spectral data for a physical item received from said spectral imaging

camera and 3D scan data for said physical item received from said

laser range scanner to identify and map in 3D coordinate space

physical features of said physical item, reflecting relative distances

between said physical features of said physical item to generate a

unique signature for said physical item,

and

record said unique signature for said physical item.

**Dr. Rady's U.S. Patent No. 12,580,734**

95.   Dr. Rady is the inventor and current owner of the '734 patent.

96. Dr. Rady's U.S. Patent No. 12,580,734 duly and legally issued on March 17, 2026

97. Dr. Rady exclusively owns all rights, title, and interest in the '734 patent, including the right

to bring this action and to recover past and future damages for Defendants' infringement of

the '734 patent.

98. Defendants are not and have never been licensed to practice Dr. Rady's '734 patent.

99. The '734 patent is valid and enforceable.

100. Claim 21 of the '734 patent recites:

An apparatus comprising:

a housing,

a spectral imaging camera mounted in or on said housing,

- 40 -

a light source mounted in or on said housing,

a power source,

a processor in electronic communication with said spectral imaging camera,

a non-transient computer-readable memory in digital communication with said processor,

said non-transient computer-readable memory comprises computer readable instructions which when executed by said processor cause said processor to:

use spectral data of a first specimen and 3D spatial information of said first specimen to generate

a) a first specimen plurality of points (x, y, z) mapping in 3D coordinate space physical features of said first specimen, and

b) a plurality of triplets [(x, y, z), (x', y', z'), (x", y" z")] of said first specimen plurality of points in said 3D coordinate space,

and

assign a unique digital signature to said first specimen, said unique digital signature comprising            .

said first specimen said plurality of points and said plurality of triplets,

wherein said physical features comprise one or more of anomalies, defects, imperfections, flaws, geometric irregularities, inclusions, occlusions, scratches, tears, and warps.

**Patent Eligibility Under 35 U.S.C. 101**

101. The claims of the '496 patent are likewise directed to patent eligible subject matter under 35 U.S.C. 101, a machine. The invention recited in the claims of the '496 patent is neither a law of nature, a natural phenomenon, nor an abstract idea.

102. The invention of claim 1 of the '496 patent is a machine with moving, operating parts, including a 3D laser scanner, a light source, a spectral imaging camera, a power source, computer processors, and a non-transient computer-readable memory, the memory including a database of unique digital signatures for a plurality of pre-recorded physical items, each

- 41 -

digital signature including a digital combination of spectral data and 3D scan data identifying and mapping in 3D coordinate space the physical features of each pre-recorded physical items.

103.   The claims of the '734 patent are likewise directed to patent eligible subject matter under 35 U.S.C. 101, a machine. The invention recited in the claims of the '734 patent is neither a law of nature, a natural phenomenon, nor an abstract idea.

104.   The invention of claim 1 of the '734 patent is a method for generating a unique digital signature for a physical item including the steps of imaging the physical item to produce 3D spatial and spectral data, using the spatial and spectral data to generate a digital 3D map of the physical item, , using the digital 3D map to generate a unique digital signature  for the physical item, comparing the unique digital signature to previously recorded unique digital signatures to determine whether scanned physical item is the same as, part of, or totally different from the previously recorded physical items by rotating the physical features of the physical item in virtual space to identify a match with the physical features of a previously recorded physical item.

105.   The invention of claim 21 of the '734 patent is a machine with moving, operating parts, including a housing, a spectral imaging camera, a light source, a power source, a computer processor, and a non-transient computer-readable memory having computer readable instructions for using spectral data and 3D spatial data of a specimen to generate a plurality of points mapping in 3D coordinate space the physical features (anomalies, defects, imperfections, scratches, tears, etc.), of the specimen and a plurality of triplets of those points, and assign to the specimen a unique digital signature to the specimen including the plurality of points and the plurality of triplets of points.

106.  No reasonable interpretation of the claims of the '496 or '734 patents can or should be allowed to transform the inventions of the claims into a mere "abstract idea." Interpreting the inventions of the '496 or '734 patents as nothing more than an abstract idea would be to completely ignore every element and limitation of the claims.

107.  To the extent any claim of the ' '496 or '734 patents might conceivably be read as directed to an abstract idea, the elements of each claim of the '261, '496 and '734 patents, both individually and as ordered combinations, transform the nature of the inventions recited therein' into a patent-eligible application.

108.  The claim elements of each claim in the '496 and '734 patents, in combination, recite a patentable invention amounting to significantly more than any mere abstract idea.

109.  Moreover, the inventions of the '496 and '734 patents are novel, unobvious, and *practical* solutions to a problem that has plagued the diamond and luxury goods industries for decades, namely, a device that can *irrefutably* identify, authenticate and establish the authenticity and provenance of any physical article, including gemstones, jewelry, watches, shoes, handbags, paintings, sculptures, etc.

110.  Prior attempts to identify, authenticate, track physical objects relied on RFIDs, NFCs, QR codes, barcodes, engravings, inscriptions, holograms, markers, etc., all of which are susceptible to fraud/forgery, duplication and/or swapping. In addition, none of these methods can be used to reliably determine whether a physical object (authentic or otherwise) has been modified (i.e., parts replaced, damaged, removed or otherwise changed). Furthermore, none of these techniques/methods can irrefutably distinguish identical mass- produced articles of the same make, model and color, etc., from one another. For example, these methods cannot

uniquely identify one genuine pair of Nike sneakers from another genuine pair of Nike sneakers of the same make, model, color and size.

111. The inventions claimed in the '496 and '734 patents solve, for the first time, all of the foregoing challenges and problems in the prior art. The inventions claimed in the '261, '496 and '734 patents can irrefutably identify, authenticate and track real world physical objects in a way that is 100% invulnerable to deception due to fraud/forgery/counterfeiting.

112. The inventions claimed in the '496 and '734 patents can irrefutably determine whether a physical object (authentic or otherwise) has been modified in any way (i.e., parts replaced, damaged, removed, or otherwise changed).

113. The inventions claimed in the '496 and '734 patents can irrefutably distinguish identical mass- produced articles of the same make, model and color, etc., from one another based on their own inherent physical features without any other identifying mark or feature.

114. For example, the inventions claimed in the '496 and '734 patents can determine that an authentic Rolex watch has been repaired with authentic Rolex parts, no matter how small/inconsequential the part or where the part is located in the watch.

115. The invention of the '496 and '734 patents is so *ingenious, creative, elegant, innovative, inventive, transformative,* non-conventional and solved such a long-sought difficult problem of irrefutably guaranteeing the authenticity and provenance of physical items, that as soon as Dr. Rady disclosed his invention to BCG (under promise of confidentiality), BCG and De Beers used it to build De Beers' Tracr, and De Beers proclaimed Dr. Rady's invention (Tracr) as significant as the industrial revolution.

116. The U.S. Patent Examiner who examined the '496 and '734 patents was informed of the district court and Federal Circuit findings that claim 1 of the '250 patent (a grandfather patent

to the '496 and '734 patents, and Dr. Rady's original patent for his invention) was ineligible subject matter. Having been informed of the district court and Federal Circuit decisions, the Examiner nevertheless determined that the claims of the '496 and '734 patents *do* recite eligible subject matter.

**BCG's Infringement of Dr. Rady's Patents**

117. BCG continues to sell and offer for sale to its corporate clients, technology that infringes Dr. Rady's '496 and '734 patents. In particular, BCG offers for sale and sells in the U.S. so-called "IoT" Sensor Boxes and IoT Tool Boxes (hereinafter collectively, "IoT Boxes") that are specifically designed to use the Tracr technology to create a digital fingerprint for scanned items using customer 3D scan data and spectral data collected from client 3D scanners and spectral imaging cameras. Stated another way, BCG's IoT Boxes dispense with the internal 3D scanners and spectral imaging cameras and instead use data from customer-placed 3D scanners and spectral imaging cameras. Specifically, BCG's IoT Boxes contain a processor and computer readable memory including instructions for taking the 3D scan data and spectral data from client devices to create a digital fingerprint for scanned items. BCG's clients that use these IoT Boxes are infringing Dr. Rady's '496 and '734 patents. These IoT Boxes are especially made for use in an infringement of Dr. Rady's '496 patent and are not a staple article or commodity of commerce suitable for substantial non-infringing use. BCG is therefore contributorily infringing Dr. Rady's '496 and '734 patents. BCG's promotion, sale of the IoT Box in the U.S. and active encouragement to infringe Dr. Rady's '496 and '734 patents constitute inducement to infringe Dr. Rady's '496 patent. In addition, BCG is inducing its customers to infringe the '496 and '734 patents, claiming Tracr as a portfolio asset and selling Dr. Rady's technology to its clients, encouraging them to implement the Tracr

technology in their businesses and products, knowing that implementation of the Tracr technology is an infringement of the '496 and '734 patents.

## DAMAGES

118. As a result of Defendant's acts of infringement, Dr. Rady has suffered and continues to suffer actual and consequential damages. However, Dr. Rady does not yet know the full extent of the infringement, and the amount of damages cannot be ascertained except through discovery and special accounting. To the fullest extent permitted by law, Dr. Rady seeks recovery of damages at least for reasonable royalties, lost profits, unjust enrichment, and benefits received by Defendant as a result of using Dr. Rady's patented technology. Dr. Rady further seeks any other damages to which he is entitled under law or in equity, including enhanced damages for Defendant's egregious conduct.

119. To remedy any ongoing and/or future harm to Dr. Rady caused by Defendant's infringement, Dr. Rady seeks a preliminary and permanent injunction preventing any further infringement.

## COUNT I
## (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT NO. 12,401,496)

120. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

121. Dr. Rady is the sole inventor and owner of U.S. Patent No. 12,401,496.

- 46 -

122. Without limiting the claims that will be asserted or the products and services that will be accused of infringement in this action, Dr. Rady asserts that at least claim 1 of the '496 patent is infringed by each of the defendants.

123. Claim 1 of the '496 patent claims the following:

A system comprising

one or more processors,

a spectral imaging camera,

a laser range scanner,

a light source,

a non-transient computer-readable memory and

a connection to a computer network,

said non-transient computer-readable memory containing computer-readable instructions which when executed by said one or more processors cause said one or more processors to:

use spectral data for a physical item received from said spectral imaging camera and

3D scan data for said physical item received from said laser range scanner to *identify*

physical features of said physical item, reflecting relative distances between said

physical features of said physical item, to generate a unique signature for said

physical item,

and

record said unique signature for said physical item.

124. BCG's corporate clients that acquire from BCG and use a BCG IoT box are directly infringing at least claim 1 of the '496 patent. On information and belief, one or more of the following clients of BCG are directly infringing the '496 patent by either using the BCG IoT

box for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate and/or by using BCG's product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI or other service/consulting offerings for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate: Renault, BMW, Ford, Nestle, GM, Shell, Bank of New York Mellon (BNY), JPMorgan, Sanofi, GlaxoSmithKline, Boeing, Airbus, Goldman Sachs, Temasek, Google, and Bayer.

125. The IoT Boxes that BCG is manufacturing, importing into, offering for sale, selling or distributing in the U.S. are a material part of the invention of at least claim 1 of the '496 patent, are especially made for use in an infringement of at least claim 1 of the '496 patent, and are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by BCG to be especially made or adapted for use in the infringement of the '496 patent. BCG clients are using the IoT Boxes in the U.S. to practice each and every element and limitation of at least claim 1 of the '496 patent are therefore directly infringing at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Dr. Rady has not authorized such manufacturing, importing into, using, offering for sale, and/or selling of the IoT Boxes by BCG, and has not authorized BCG's clients to practice the invention of at least claim 1 of the '496 patent.

126. BCG's product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI which BCG is offering for sale in the U.S. for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate, are a material part of the invention of at least claim 1 of the '496 patent, are especially made for use in an infringement of at

- 48 -

least claim 1 of the '496 patent, are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by BCG to be especially made or adapted for use in the infringement of the '496 patent. BCG clients are using the Value Chain Digital Twin, Bionic Supply Chain, Metachain AI for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate in the U.S., are practicing all of the elements of at least claim 1, and are therefore directly infringing at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Dr. Rady has not authorized such offering for sale, and has not authorized BCG's clients to practice the invention of at least claim 1 of the '496 patent.

## COUNT II
### (INDUCEMENT TO INFRINGE U.S. PATENT NO. 12,401,496)

127. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

128. BCG's corporate clients that acquire from BCG and use a BCG IoT box are directly infringing at least claim 1 of the '496 patent. On information and belief, one or more of the following clients of BCG are directly infringing the '496 patent by either using the BCG IoT box for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate and/or by using BCG's product offerings "Value Chain Digital Twin", Bionic Supply Chain, Metachain AI or other service/consulting offerings for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate: Renault, BMW, Ford, Nestle, GM,

Shell, Bank of New York Mellon (BNY), JPMorgan, Sanofi, GlaxoSmithKline, Boeing, Airbus, Goldman Sachs, Temasek, Google, and Bayer.

129. Upon information and belief, Defendant has actively induced infringement of the '496 patent without authority in violation of 35 U.S.C. § 271(b). Specifically, Defendant understand, intend, and encourage the use of the IoT Box by its clients knowing that its use as intended and instructed by BCG infringes at least one claim of the '496 patent.

130. BCG is inducing others in the U.S. to infringe at least claim 1 of the '496 patent, by actively encouraging its clients to use the IoT Box in connection creating digital fingerprints, with actual knowledge of the '496 patent, knowing that use of the IoT Box necessarily constitutes a direct infringement of at least claim 1 of the '496 patent.

131. BCG is inducing others in the U.S. to infringe at least claim 1 of the '496 patent, by actively encouraging its clients to use the product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate, with actual knowledge of the '496 patent, knowing that use of the "Value Chain Digital Twin", Bionic Supply Chain, Metachain AI for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate, constitutes a direct infringement of at least claim 1 of the '496 patent.

## COUNT III
### (CONTRIBUTORY INFRINGEMENT OF U.S. PATENT NO. 12,580,734)

132. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

133. Dr. Rady is the sole inventor and owner of U.S. Patent No. 12,401,496.

134. Without limiting the claims that will be asserted or the products and services that will be accused of infringement in this action, Dr. Rady asserts that at least claim 1 of the '496 patent is infringed by each of the defendants.

135. Claim 1 of the '734 patent claims the following:

A method for generating a unique digital signature for a physical item comprising:

- imaging said physical item to produce 3D spatial information and spectral data,

- using said 3D spatial information and said spectral data to generate a digital 3D spatial map of said physical item, mapping in 3D coordinate space physical features of said physical item,

- using said digital 3D spatial map to generate a unique digital signature for said physical item,

- comparing said unique digital signature to a plurality of previously recorded unique digital signatures corresponding to a plurality of previously imaged physical items to determine whether said physical item is identical to, part of, or completely different from any of said previously imaged physical items,

    - wherein said comparing step includes rotating in virtual space said physical features of said physical item defined by said unique digital signature to identify a match with physical features defined by one of said plurality of previously recorded digital signatures,

and

- recording said unique digital signature on a non-transient computer readable memory.

136. BCG's corporate clients that acquire from BCG and use a BCG IoT box are directly infringing at least claim 1 of the '734 patent. On information and belief, one or more of the following clients of BCG are directly infringing the '734 patent by either using the BCG IoT box to carry out the method of claim 1 of the '745 patent for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate and/or by BCG's product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI or other service/consulting offerings for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate: Renault, BMW, Ford, Nestle, GM, Shell, Bank of New York Mellon (BNY), JPMorgan, Sanofi, GlaxoSmithKline, Boeing, Airbus, Goldman Sachs, Temasek, Google, and Bayer.

137. Use of the IoT Boxes that BCG is manufacturing, importing into, offering for sale, selling or distributing in the U.S. is a material part of the invention of at least claim 1 of the '734 patent; the IoT Boxes are especially made for use in an infringement of at least claim 1 of the '734 patent, and are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by BCG to be especially made or adapted for use in the infringement of the '734 patent. BCG clients are using the IoT Boxes in the U.S. to practice each and every element and limitation of claim 1 of the '734 patent and therefore are directly infringing at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Dr. Rady has not authorized such manufacturing, importing into, using, offering for sale, and/or selling of the IoT Boxes by BCG, and has not authorized BCG's clients to practice the method of claim 1 of the '734 patent.

138. BCG's product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI which BCG is offering for sale in the U.S. for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate are a material part of the invention of at least claim 1 of the '734 patent, are especially made for use in an infringement of at least claim 1 of the '734 patent, and are not a staple article or commodity of commerce, have no substantial non-infringing use, and are known by BCG to be especially made or adapted for use in the infringement of the '734 patent. BCG clients are using the Value Chain Digital Twin, Bionic Supply Chain, Metachain AI for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate in the U.S., to practice all of the elements and limitations of at least claim 1 of the '734 patent and are therefore directly infringing at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Dr. Rady has not authorized such offering for sale, and has not authorized BCG's clients to practice the invention of at least claim 1 of the '734 patent.

## COUNT IV
### (INDUCEMENT TO INFRINGE U.S. PATENT NO. 12,580,734)

139. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

140. BCG's corporate clients that acquire from BCG and use a BCG IoT box are directly infringing at least claim 1 of the '734 patent. On information and belief, one or more of the following clients of BCG are directly infringing the '734 patent by either using the BCG IoT box for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-

estate and/or BCG's product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI or other service/consulting offerings for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate: Renault, BMW, Ford, Nestle, GM, Shell, Bank of New York Mellon (BNY), JPMorgan, Sanofi, GlaxoSmithKline, Boeing, Airbus, Goldman Sachs, Temasek, Google, and Bayer.

141. Upon information and belief, BCG has actively induced infringement of the '734 patent without authority in violation of 35 U.S.C. § 271(b). Specifically, BCG understands, intends, and encourages its clients to acquire and use IoT box, knowing that use of the IoT Box infringes at least one claim of the '734 patent.

142. BCG is inducing others in the U.S. to infringe claim 1 of the '734 patent, by actively encouraging its clients to use the IoT Box in connection creating digital fingerprints, with actual knowledge of the '734 patent, knowing that use of the IoT Box necessarily constitutes a direct infringement of claim 1 of the '734 patent.

143. BCG is inducing others in the U.S. to infringe at least claim 1 of the '734 patent, by actively encouraging its clients to use the product offerings Value Chain Digital Twin, Bionic Supply Chain, Metachain AI for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate, with actual knowledge of the '734 patent, knowing that use of the Value Chain Digital Twin, Bionic Supply Chain, Metachain AI for generating high-fidelity digital twins for product identification, authentication, and for creating high-fidelity digital twins of manufactured real-world physical objects and real-estate, necessarily constitutes a direct infringement of at least claim 1 of the '734 patent.

## JURY DEMAND

144. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Dr. Rady respectfully requests that all issues and claims so triable be tried before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Rady prays for the following judgment and relief against Defendants:

A.     A judgment that the Defendant has infringed the '496 patent, and the '734 patent;

B.     A preliminary and permanent injunction against Defendant and its affiliates, subsidiaries, assigns, employees, agents, and anyone acting in privity or concert with them, from infringing the '496 and '734 patents;

C.     An award of all damages adequate to compensate Dr. Rady for Defendant's patent infringement;

D.     An award of treble damages as a result of Defendant's willful infringement of the '496 patent and the '734 patent;

E.     An award of pre-judgement and post-judgment interest at the maximum rate allowed by law;

F.     An award finding that this is an exceptional case and awarding Dr. Rady his costs, expenses, disbursements, and reasonable attorneys' fees related to Defendant's patent infringement under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law; and

G.     Such other relief, in law or in equity, as this Court deems just and proper.

Dated: June 29, 2026

Respectfully submitted,

THE PLAINTIFF,

MAX A. RADY,

By his attorney,

/s/ Kent Sinclair
Kent D.B. Sinclair (BBO No. 639597)
SINCLAIR LAW LLC
Box 5503
Beverly, MA 01915
(781) 454-7208
ksinclair@kentsinclair.com

Peter J. Davis (MD Bar No. 14069)
(*pro hac vice* motion to be filed)
pdavis@whitefordlaw.com
Steve Tiller (MD Bar No. 11085)
(*pro hac vice* motion to be filed)
stiller@whitefordlaw.com
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street, Suite 1500
Baltimore, MD 21202-1636
(410) 347-8700